UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

| | | |
|---|---|---|
| AMERICAN CANOE | ) | |
| ASSOCIATION, INC., et al., | ) | |
| | ) | Civil Action No. 01-99-ART |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| CITY OF LOUISA, KENTUCKY, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Plaintiffs American Canoe Association, Inc. and the Sierra Club filed a motion for attorney fees and expenses, R. 175, pursuant to 33 U.S.C. § 1365(d). They request fees of $1,195,769.90 and expenses of $262,499.54 through October 28, 2009. R. 177 at 15. Defendant City of Louisa responded, challenging the application, and proposing an award of $56,850 and expenses of $5,550.90. R. 176 at 39. For the reasons stated below, American Canoe will receive $418,720.09 in attorney fees and $62,165.96 in expenses.

## I. FACTUAL SUMMARY

On March 19, 2001, Plaintiffs American Canoe Association, Inc. and the Sierra Club (collectively, "American Canoe") notified the Louisa Water Treatment Plant and the City of Louisa Water & Sewer Commission of their violations of 33 U.S.C. § 1251 *et seq.* ("Clean Water Act"). The City of Louisa processes drinking water from the Big Sandy River through a water treatment plant. R. 1 at 6. In 2001, the plant operated under a National Pollution Discharge Elimination System ("NPDES") permit that the Commonwealth of Kentucky re-issued in 1996

under the Clean Water Act. *Id.* at 7. On April 19, 2001, the Commonwealth of Kentucky's Natural Resources and Environmental Protection Cabinet initiated an administrative enforcement action against Louisa. R. 105, Ex. 1. Negotiations between the Commonwealth and Louisa produced a settlement on August 7, 2001. *Id.* Louisa planned to renovate its water treatment plant to comply with the permit by March 31, 2003. *Id.* at 2. Defendants also paid the Commonwealth a $3,000 civil penalty. *Id.* American Canoe played no part in these negotiations although Louisa updated it throughout the settlement discussions. R. 167 at 10. The new water treatment plant came into service on October 1, 2003. R. 105 at 21-22. The City of Louisa received official notification that it had complied with the settlement on April 15, 2004. R. 176 at 8. Though it drastically minimized violations of the NPDES permit, occasional violations still continued. R. 167 at 11-12. The plant continues to have minor chlorine releases and bypasses to this day. *Id.*

In the meantime, American Canoe filed a citizen suit under 33 U.S.C. § 1365 ("Clean Water Act") based on the Louisa Water Treatment Plant and the City of Louisa Water & Sewer Commission's repeated violations of the NPDES permit. *See* R. 1. Terris, Pravlik & Millian, LLP ("TPM"), a Washington, D.C.-based environmental law firm, represented American Canoe. *See id.* American Canoe sought a declaratory judgment, injunctive relief, civil penalties, and costs, including attorney fees and expert witness fees, for the permit violations. *Id.* On August 17, 2001, American Canoe added the City of Louisa as a Defendant. R. 8. On June 11, 2002, the Court dismissed this case for lack of standing. R. 19. On November 29, 2004, the Sixth Circuit reversed and remanded this case to the Court. R. 31. The Court dismissed the Louisa

2

Water Treatment Plant and the City of Louisa Water & Sewer Commission, leaving the City of Louisa ("Louisa") as the only Defendant.  R. 114, 137.

On February 27, 2009, Louisa won partial summary judgment, and the Court dismissed American Canoe's claims for civil penalties for the alleged post-2001 violations.  *See* R. 137. American Canoe won partial summary judgment for civil penalties arising out of proven pre-2001 violations.  *See Id.*  On July 20, 2009, the Court ordered Louisa to pay $30,000 in civil penalties and denied American Canoe's request for injunctive relief.  *See* R. 163.

Now, pursuant to § 1365(d), American Canoe asks Louisa to pay $1,160,117.20 in attorney fees, which it calculated based on Washington, D.C. billing rates, and $261,720.42 in expenses incurred through September 10, 2009.  R. 175 at 1.  American Canoe also seeks an additional $35,652.70 in fees and $779.12 in expenses incurred from September 10, 2009, to October 28, 2009, for preparing its reply brief to its attorney fee petition.  R. 177 at 15.  Louisa disputes whether American Canoe should receive any attorney fees at all, and also challenges American Canoe's number of hours worked, its hourly rate, and its expense calculations.  *See* R. 176.

## II. SUBSTANTIALLY PREVAILING PARTY

Under the Clean Water Act, a court may award costs of litigation "to any prevailing or substantially prevailing party, whenever the court deems such an award is appropriate."  33 U.S.C. § 1365(d).  The bulk of attorney fee case law comes from claims under 42 U.S.C. § 1988(b), the statute for attorney fees in civil rights actions.  The Supreme Court has applied those standards to attorney fees in environmental law cases.  *See City of Burlington v. Dague*, 505 U.S.

557, 561-62 (1992); *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546,

559 (1986) (citing *Northcross v. Memphis Bd. Of Educ. Of Memphis City Sch.*, 412 U.S. 427,

428 (1973)).  In the only case where the Sixth Circuit considered an award under § 1365(d), it

too followed the § 1988(b) line of cases.  *See Sierra Club v. Hamilton County Bd. of County*

*Comm'rs*, 504 F.3d 634, 656 (6th Cir. 2007) (citing *Buckhannon Bd. and Care Home, Inc. v. W.*

*Va. Dep't of Health and Human Res.*, 532 U.S. 598 (2001)).  Thus, the § 1988(b) standards apply

here.

      As a threshold matter, American Canoe is entitled to attorney fees under the Clean Water

Act because it substantially prevailed in this lawsuit.  "[A] plaintiff 'prevails' when actual relief

on the merits of his claim materially alters the legal relationship between the parties by

modifying the defendant's behavior in a way that directly benefits the plaintiff."  *Farrar v.*

*Hobby*, 506 U.S. 103, 111-12 (1992).[1]  American Canoe's notice letter sparked a chain of events

that changed Louisa's behavior; after the notice was filed, Louisa entered negotiations with the

Commonwealth of Kentucky to build a new water treatment facility and to comply with the

Clean Water Act.  American Canoe reached the goal of its litigation—to force Louisa to comply

with the Clean Water Act regulations.  The Supreme Court has held that "a plaintiff is a

'prevailing party' when he receives 'at least some relief on the merits of his claim,' even nominal

---

     [1]In this case, it could be argued that the change in the behavior did not "directly benefit"
two organizations–neither of which reside in the Commonwealth of Kentucky.  The Sixth Circuit
resolved this issue when it found that American Canoe and Sierra Club's "claims rest upon their
organizational interests which are negatively affected by the defendants' failure to fulfill its
monitoring and reporting obligations."  *See American Canoe Ass'n v. City of Louisa Water &*
*Sewer Comm'n*, 389 F.3d 536, 546 (6th Cir. 2004).  It also found that the members of American
Canoe and Sierra Club had suffered sufficient informational and aesthetic/recreational injuries.
*Id.* at 541-42.

4

damages." *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 835 (6th Cir. 2005) (quoting *Buckhannon*, 532 U.S. at 603). Louisa was required to pay a $30,000 civil penalty for its violations. In addition to building a new water treatment facility, payment of the civil penalty constitutes relief on the merits.

Further, American Canoe prevailed in its litigation by holding Louisa accountable for its monitoring and reporting violations in addition to its discharge violations. The Sixth Circuit, when considering the appeal to the standing decision, held that even if the renovation project made it substantially likely that the discharge violations would not recur, that would not mean that the monitoring and reporting violations would end as well. *American Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 543-44 (6th Cir. 2004). Indeed, upon remand this Court found in February 2009, that even since completion of the water treatment plant there had already been 161 monitoring violations and 98 reporting violations. R. 167 at 10 (citing R. 84, Ex. 5-8). The Court concluded that "[t]here is no question that the fact that this lawsuit has been hanging over the City has caused it to begin the process of becoming a compliant City." *Id.* at 14. American Canoe prevailed in its pursuit of the discharge, reporting, and monitoring violations, and thus, substantially prevailed in this litigation.

Louisa argues that since American Canoe's success was *de minimis*, it did not substantially prevail and, thus, it should not receive an award of attorney fees. R. 176 at 6-7. This is incorrect. The degree of American Canoe's success does not affect its status as a prevailing party, so long as American Canoe achieved "some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quoting *Nadeau v. Helgemoe*,

5

581 F.2d 275, 278-79 (1st Cir. 1983)). It did. The Court noted when awarding the $30,000 civil penalty that "the plaintiffs are at least in part the prevailing parties here, and therefore are entitled to attorneys' fees and costs." R. 167 at 16. American Canoe's *degree* of success is an important factor in adjusting the lodestar to a reasonable amount in light of the hours expended. *See infra*, IV. A. But overall, American Canoe substantially prevailed under § 1365(d) and, as a result, will receive reasonable attorney fees.[2]

### III. LODESTAR ANALYSIS

"'The primary concern in an attorney fee case is that the fee awarded be reasonable,' that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (quoting *Reed v. Rhodes*, 179 F.3d 543, 471 (6th Cir. 1999)). In determining the amount of an attorney fee award, courts begin by calculating the fee applicant's "lodestar," which is the "proven number of hours reasonably expended on the case by an attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (citing *Hensley*, 461 U.S. at 433).

---

[2]American Canoe also argues it should recover attorney fees for work on its unsuccessful claims under the catalyst theory of liability. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 67 n.6 (noting that the legislative history of the Clean Water Act states that the award of costs "should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict") (citations omitted). However, the Supreme Court drastically undercut the catalyst theory, and the Sixth Circuit has questioned its validity for Clean Water Act cases. *See Sierra Club v. Hamilton County Bd. of County Comm'rs*, 504 F.3d 634, 643 (6th Cir. 2007) ("It is an open question whether the catalyst theory remains viable in the context of environmental statutes like the CWA that limit attorneys' fees to a prevailing party or substantially prevailing party." (quoting *Ailor v. City of Maynardville*, 368 F.3d 587, 601 n.6 (6th Cir. 2004))). Regardless, American Canoe substantially prevailed so the lodestar analysis, not the catalyst theory, applies.

6

### A. Reasonable Hourly Rate

American Canoe seeks compensation based on its attorneys' hourly rate in Washington, D.C.  R. 175 at 19-24.[3]  The first step in determining a reasonable rate is to look at the "'the prevailing market rate in the relevant community.'"  *Adcock-Ladd*, 227 F.3d at 350 (quoting *Blum v. Stevenson*, 465 U.S. 886, 895 (1984)).  The prevailing market rate is that rate which "lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices." *Id.* (citing *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir. 1997)).  Under this standard, American Canoe should receive Kentucky rates because this entire lawsuit was litigated in Kentucky.

Then, the burden shifts to plaintiffs to try to prove that the standard local rates should not apply.  American Canoe must show that:  (1) hiring an out of town attorney was reasonable and (2) the rates sought are reasonable for an attorney of his or her degree of skill, experience, and reputation.  *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) (citations omitted).

One aspect of the reasonableness analysis is whether "it is necessary to retain outside, non-local counsel after a good-faith effort to locate local counsel fails."  *Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 WL 145187, at *7 (6th Cir. Jan. 31, 2000).  American Canoe argues that "it would have been extremely difficult, and probably impossible, to find an attorney in Kentucky who would be willing both (1) to represent environmental groups in environmental

---

[3]American Canoe asks for attorney fees based on the *Laffey* matrix, an accurate and updated schedule of attorney fees in the District of Columbia as approved by the D.C. Circuit.  R. 175 at 20.

litigation against Kentucky defendants and (2) to do so for no compensation except for the potential award of attorneys' fees and expenses at the end of the litigation."  R. 175 at 17 (citations omitted).  It is wrong on both counts.

**1. Very competent attorneys in Kentucky were available.**  There are multiple counsel in Kentucky that handle environmental law matters and did so in 2001.  David O. Welch, a practitioner in Ashland, Kentucky, has handled environmental work in asbestos cases throughout Kentucky at the state and federal level since before 2001.  *See* R. 182, Ex. 2 ("Supp. Welch Aff.").  The Ashland law firm of VanAntwerp, Monge, Jones, Edwards and McCann, LLP, has handled administrative and litigation matters involving environmental issues including NPDES permits since before 2001.  *See* R. 176, Ex. 10 ("Monge Aff."); R. 182, Ex. 3 ("Supp. Monge Aff.").  The Kirk Law Firm, in Eastern Kentucky, represented 523 plaintiffs in a civil action relating to a Martin County Coal slurry spill.  *See* R. 176, Ex. 13 ("Salyer Aff.").  That litigation lasted from 2000 through 2005.  *See* R. 182, Ex. 1 ("Supp. Salyer Aff.").  Ned Pillersdorf has practiced environmental law in Prestonburg, Kentucky, since 1985, and he also represented plaintiffs in the Martin County Coal litigation.  *See* R. 182, Ex. 4 ("Supp. Pillersdorf Aff.").

American Canoe submits affidavits from four Kentucky environmental law attorneys who state that they do not know any Kentucky counsel that could have taken this case in 2001.  R. 175, Exs. 24-27.  Given the counsel discussed above, these affidavits are not credible.  Not only were Kentucky counsel available, the Court has had regular interaction with the counsel mentioned above and has no question that they are competent to handle a case involving these issues.  *See Harmon v. McGinnis, Inc.*, 263 F. App'x 465, 468 (6th Cir. 2008) ("[J]udges may

question the reasonableness of an out-of-town attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate." (quoting *Hadix*, 65 F.3d at 535)).  Thus, competent Kentucky counsel existed.

Moreover, there is no evidence that American Canoe ever tried to locate local environmental law counsel and that such counsel declined representation.  Indeed, the evidence shows that TPM sought out clients and not the converse.  For example, Sierra Club's chair stated, "attorneys at Terris, Pravlik & Millian, LLP and attorney Hank Graddy recommended to Sierra Club that it initiate this Clean Water Act enforcement suit."  R. 17, Ex. 6 at 3.  There is evidence that TPM looked for clients who had standing (i.e., clients that had a concrete and real interest in this suit); TPM billed hours for "calls to possible standing affiants" in American Canoe's fee petition.  R. 175, Ex. 7 at 2-3.  There is no such evidence that American Canoe contacted any counsel in Kentucky to see if they could handle a case like this.  The fact that TPM initiated the case corroborates the fact that American Canoe made no effort to consult with local counsel before filing this lawsuit.

"[I]t is within the discretion of the district court to determine what the relevant jurisdiction is and how much compensation is reasonable."  *Sigley*, 2000 WL 145187, at *7. American Canoe repeatedly argues, quoting *Sigley*, that retaining out of town counsel is reasonable if "the non-local counsel possesses specialized expertise in the matter to be litigated." R. 175 at 15; R. 184 at 2-3.  Though their argument has merit, expertise of counsel is only one element of the reasonableness analysis.

More importantly, "[p]roof that [an attorney] has a national reputation for expertise in this

kind of litigation does not constitute proof that her expertise was necessary in this phase of the present litigation." *Hadix*, 65 F.3d at 535.   Though TPM certainly possess special expertise in environmental law, this lawsuit did not require Clean Water Act experts.   The Court agrees that the standing issues presented were novel, R. 175 at 26-27, but those issues were a small fraction of the total hours TPM spent on this case.   Moreover, TPM created this "novel" issue when it solicited clients, as opposed to local clients seeking TPM to right a wrong–as is ordinarily done in lawsuits.   Further, the Clean Water Act is a strict liability statute.   This case was primarily about the type of relief that would be awarded and did not require an extensive knowledge of Clean Water Act law.   It did require expertise in biology, but TPM and Louisa both hired scientific experts to handle these issues.

American Canoe argues that no Kentucky law firms have even close to TPM's experience in Clean Water Act cases.   R. 166 at 7.   Section 1365(d), however, does not guarantee plaintiffs the best counsel, it guarantees competent counsel.   *See Hadix*, 65 F.3d at 535 (citing 42 U.S.C. § 1988); *Anderson v. Wilson,* 357 F. Supp. 2d 991, 997-98 (E.D. Ky. 2005) (stating that the plaintiff was not entitled to the best First Amendment counsel in the country even though hiring out-of-town counsel was reasonable).

   **2.   Kentucky counsel handle expensive, complex litigation.**   American Canoe's contentions that Kentucky counsel would not take this case because of the *potential* of lengthy, costly, or complex litigation are not credible.   American Canoe submits affidavits from Kentucky counsel who state that no Kentucky counsel would have taken this case.   *See* R. 175 at 17-18; R. 177 at 12-13; R. 184.   The Ashland docket itself has current examples of local counsel

10

handling large, complex cases without any guarantee of recovery. For example, in *Caudill v. E.I. Dupont De Nemours and Co.*, No. 04-CIV-229 (E.D. Ky) plaintiffs' counsel all hail from Kentucky and Cincinnati, Ohio. *Caudill* is a tort case with over 170 plaintiffs who allege injuries from a release of toxic chemical gas. The case was filed in 2004 and will possibly involve 17 jury trials when it is complete. At present, that case is a contingency case with a ten-year horizon and no guarantee of recovery for plaintiff's counsel.

At the beginning of this case in 2001, no one could have predicted its ultimate outcome or that this litigation would last eight years. American Canoe's affiants have the benefit of hindsight; something no attorney has at the outset of a case. Further, several Kentucky environmental law attorneys (including American Canoe's affiant Joe Childers) represented plaintiffs in the Camp Branch Coal Mining case, which lasted from 2002 to 2008. *See* R. 183, Ex. 1 ("Second Supp. Pillersdorf Aff."). That case involved environmental damage to property and water wells caused by the removal of coal pillars in underground coal mining. *Id.* The plaintiffs, represented by Kentucky environmental law counsel, won this case in Letcher Circuit Court after six years of litigation, and counsel was compensated by a fee-shifting statute only *after* the litigation ended. *Id.*

Finally, American Canoe relies on its longstanding and close relationship with TPM as a reason for selecting out-of-town counsel. R. 175 at 16-17. American Canoe cites two cases for the proposition that relationship with counsel is an important factor in the analysis. *See Graceland Fruit, Inc. v. KIC Chemcials, Inc.*, 320 F. App'x 323, 329-30 (6th Cir. 2008); *American Booksellers Assoc., Inc. v. Hudnut*, 650 F. Supp. 324, 328 (S.D. In. 1986). But in both

11

of these cases the courts considered many factors. In fact, in *Graceland Fruit*, the fact that out-of-state law governed the contract at issue in the case also weighed heavily on the court's decision. 320 F. App'x at 329-30. No out of state law or facts were present in this litigation. The attorney-client relationship was not dispositive in either case, nor is it here. The long-standing relationship favors American Canoe's choice of out of town counsel, but does not trump the other factors that cut against American Canoe's request for out-of-town rates: the fact that local counsel were readily available, and that this litigation did not require a high level of Clean Water Act expertise.

American Canoe cites many cases where defendants in Kentucky environmental cases retained out of town counsel. R. 175 at 18-19. However, these cases do not deal with attorney fee awards or whether retention of out of town counsel was reasonable. Instead, they are cases where defendants, not plaintiffs, chose to hire out of town counsel. Thus, they do not affect the Court's analysis here.

Therefore, the appropriate rates are the hourly rates for a Kentucky law firm. After considering the affidavits from Kentucky environmental attorneys, reasonable hourly rates are: $300 for partner work, $150 for associate level work, and $75 for paralegal work. In 2008, the Kentucky Circuit Court awarded these rates to Pillersdorf and other Kentucky environmental attorneys in the Camp Branch Coal Mining case mentioned above. *See* Second Supp. Pillersdorf Aff. The attorney fee award was under a fee-shifting statute similar to § 1365(d). Thus, the Kentucky Circuit Court has approved these as fair rates for Kentucky attorneys. The rates also

fall at the upper end of the range proposed by the Kentucky environmental law counsel.[4]

The Court applied current market rates, because "using current market rates rather than those applicable at the time services were rendered" is an appropriate way to compensate counsel for their delay in payment in multi-year litigation. *Missouri v. Jenkins*, 491 U.S. 274, 277-85 (1989) (citations omitted); *see also Dowling v. Litton Loan Servicing LP*, 320 F. App'x 442, 447 (6th Cir. 2009) (citing *Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005)). Thus, current market rates are used. Even though they are adopted from rates awarded in 2008, attorney billing rates do not change drastically from year to year. In fact, under the *Laffey* matrix that American Canoe proposes, the 2009-10 rates are the same as the 2008-09 rates. R. 175, Ex. 15.

## B. Hours Reasonably Expended

American Canoe is only entitled to hours "reasonably expended." *Hensley*, 461 U.S. at 434 (quoting S.Rep. No. 94-1011, p. 6 (1976)). Since the 75.16 hours American Canoe spent searching for standing affiants and the 23.5 hours it spent on its response to Louisa's 2008 summary judgement motion were "excessive, redundant, or otherwise unnecessary," the Court will exclude those hours from American Canoe's recovery. *Id.* The remaining hours were reasonably expended, and thus, will be part of American Canoe's award. The parties' arguments as to the reasonableness of the hours expended are each addressed here.

---

[4]Kyle Salyer states that he charges between $100 and $150 per hour. R. 183, Ex. 2. David O. Welch states that his hourly rate has been $150 per hour since 2005. R. 182, Ex. 2. Gregory L. Monge states that the current hourly rates at his law firm, VanAntwerp, Monge, Jones, Edwards & McCann, LLP, are: $275 per hour for partners, $200 per hour for associates, $95 per hour for paralegals. R. 183, Ex. 4.

### 1. Time spent on unsuccessful claims

American Canoe seeks payment for all of the hours spent on this litigation.  R. 175 at 3-13.  Louisa argues that American Canoe should not recover attorney fees for the time it spent litigating its unsuccessful claims, namely, its claims for injunctive relief.  R. 176 at 3-5.  The Supreme Court in *Hensley,* however, expressly forbid a district court from determining fees based on the success or the failure of individual claims when the claims arise from a common core of facts or related legal concepts.  461 U.S. at 448; *cf. Deja Vu of Nashville v. The Metro. Gov't. of Nashville and Davidson County, Tenn.,* 421 F.3d 417, 423 (6th Cir. 2005) ("[A] court should not reduce attorney fees based on a simple ratio of successful claims to claims raised." (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996))).  Instead, "when claims are based on a common core of facts or are based on *related* legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced."  *Thurman*, 90 F.3d at 1169.

American Canoe's claims all have the same legal theories since they all arose under the same Clean Water Act violations.  American Canoe asked for injunctive relief, declaratory relief, and civil penalties due to Louisa's violation of its NPDES permit.  R. 8 at 9.  The injunctive and civil penalties claims were all under the Standards and Enforcement section of the Clean Water Act.  Fees are rarely split because work was on unrelated successful and unsuccessful claims; however, they can be split when the claims were so different that the lower court bifurcated the trial.  *Smiljanich v. General Motors Corp.*, 302 F. App'x 443, 452-53 (6th Cir. 2008).

The underlying facts of each of American Canoe's Clean Water Act claims are also the

same.  The claims all arise from Louisa's violations of its NPDES permit and, thus, should be treated as related for attorney fees.  Claims are related even when their legal arguments vary widely, as long as they arise from a common set of facts.  For example, in *Jordan v. City of Cleveland*, the plaintiff prevailed on retaliation and harassment claims, but lost on racial discrimination and racial harassment claims.  464 F.3d at 603.  Though they were different legal arguments, the Sixth Circuit awarded attorneys fees for work on all the claims because they arose out of "precisely the same facts."  *Id.; see also Imwalle v. Reliance Medical Prods., Inc.*, 515 F.3d 531, 555 (6th Cir. 2008) (upholding a district court's award, in part, because "[c]ommon facts [we]re at the heart of all of Imwalle's claims, both successful and unsuccessful").  Most recently, the Sixth Circuit affirmed awards for related legal claims even though the one victorious claim was based on the Fair Debt Collection Practices Act, while the other claims were based on the Real Estate Settlement Procedures Act and Ohio law.  *Dowling*, 320 F. App'x at 447-49.

Because American Canoe's claims were based on the same facts and legal theories, they are all related under *Hensley* and their fees are not subject to division.

### 2. Time spent pursuing relief for post-2001 violations

Louisa argues that American Canoe should not be compensated for *any* of its work on the post-2001 violations because the Court lacked jurisdiction to decide the claims.  R. 176 at 2, 4-5. Louisa is wrong.

Louisa cites *Greater Detroit Resources Recovery Authority v. EPA*, 916 F.2d 317 (6th Cir. 1990), for the proposition that the Court lacked jurisdiction.  In *Greater Detroit*, the district

15

court awarded attorney fees under the Equal Access to Justice Act in a case where plaintiffs enjoined the EPA from revoking a permit. *Id.* at 319. The Sixth Circuit reversed, holding that there was no jurisdiction for the underlying action, and that "[u]nless the statute under which a party seeks attorney's fees contains an independent grant of jurisdiction, an appellate court must vacate an award of attorney's fees if the district court did not have subject matter jurisdiction over the litigation." *Id.* at 320 (citing *Latch v. United States*, 842 F.2d 1031, 1033 (9th Cir. 1988)). The Clean Water Act provides an independent grant of jurisdiction to federal courts. *See* 33 U.S.C. 1365(a).

While the Clean Water Act provides an independent grant of jurisdiction, it also provides that "no action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation." 33 U.S.C. 1365(b). American Canoe's notice letter covered violations only up until April 2001. R. 1, App'x A. It never provided notice of suit for the violations after April 2001, though it pursued relief for them throughout this litigation.

Thus, if those claims were wholly unrelated and could be divided easily from the meritorious claims, the Court could reduce the fee accordingly. Claims are related for the purposes of an attorney fee calculation "when counsel's time is 'devoted generally to the litigation as a whole, making it difficult to divide the hours expended.'" *Barnes*, 401 F.3d at 745 (quoting *Hensley*, 461 U.S. at 433). In this case, the pre- and post-2001 claims are almost identical. Indeed, the legal issues for pre-2001 and post-2001 violations were exactly the same, and TPM's time was spent working on relief for the violations generally, not for each specific violation. Therefore, most of their time cannot be divided based on whether it was spent on pre-

2001 or post-2001 violations.

However, there is one area where American Canoe spent time only on the post-2001 violations, and these hours can be eliminated from the hours reasonably expended. On May 9, 2008, Louisa filed a motion for partial summary judgment arguing that American Canoe could not recover for the post-2001 violations. *See* R. 85. TPM attorneys spent 75.16 hours working on American Canoe's response to Louisa's motion for summary judgment, arguing that they were entitled to relief on the post-2001 violations. *See* R. 175, Ex. 6 at 11 (Pl. Opposition Brief and Oral Argument). The Court dismissed the post-2001 violation claims for failure to provide notice as required under the Clean Water Act. *See* R. 137.

For American Canoe to spend 75.16 hours disputing the notice issue was unreasonable. Based on the plain language of the Clean Water Act, American Canoe should have known it had no hope of obtaining relief on the post-2001 claims. Therefore the 75.16 hours spent on the response to the motion for summary judgment are deducted from the reasonable hours expended.

### 3. Time spent on the case after Louisa's 2004 compliance with the NPDES permit

Louisa argues that American Canoe should not be compensated for time spent on this litigation after 2004. R. 176 at 14-17. By the time the Sixth Circuit held that American Canoe had standing and remanded this case to the district court in 2004, Louisa had built a new water treatment plant in order to comply with the Clean Water Act. R. 105 at 21-22. Louisa argues that doggedly pursuing these claims until 2009 was unreasonable.[5]

---

[5]Louisa further argues that if American Canoe had conducted a proper investigation before filing suit, it would have discovered that it had no claim for environmental harm. R. 176 at 20-21. For this proposition Louisa cites *Sierra Club v. Cripple Creek and Victor Gold Mining*

It is unclear what Louisa expected American Canoe to do at this point.  Presumably, Louisa believes that once the water treatment plant was built, American Canoe should have brought the litigation to a swift end.  But Louisa waited until its 2008 motion for summary judgment—five years after opening the new water treatment plant—to argue that no further meaningful relief was available.  R. 85 at 21-24.  Louisa "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."  *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980) (en banc)).

American Canoe, however, did try to end the litigation.  Throughout the course of this litigation American Canoe has made settlement offers.  It offered to settle the lawsuit for $25,000 in 2001, shortly after the case was filed, with several subsequent offers well below the fees now sought.  R. 177 at 5-7; *see also* R. 177, Ex. 29 (Second Terris Aff.).  In August 2007, before expert depositions began, American Canoe proposed settlement for a $75,000 fee and $375,000 attorney fees.  *See* Second Terris Aff.  Further, American Canoe filed three summary judgment motions that the Court denied.  R. 45, R. 77, R. 114.  This case did not involve novel issues under the Clean Water Act.  This was a strict liability case.  *See* R. 167 at 3; R. 137 at 20.  Once the standing issue was resolved, this case should have moved to a swift end.  The fact that it did

---

*Company*, 509 F. Supp.2d 943 (D. Colo. 2006).  *Cripple Creek*, however, is inapposite.  There, the district court held that *defendants*—not plaintiffs—should receive attorney fees because plaintiffs had pursued claims for which there was no relief.  *Id.* at 950-51.  Unlike in *Cripple Creek*, American Canoe had a remedy available.  As the Court previously found, the Clean Water Act is a strict liability statute and the defendants have never contested that they violated it in various ways including discharge, reporting, and monitoring violations.  *See* R. 167 at 3; R. 137 at 20.

not cannot be laid solely at the feet of American Canoe.  Stated differently, "[t]he defendants cannot now escape the consequences of their litigation choices."  *ACLU v. McCreary County, Ky.*, No. 99-507, 2009 WL 720904, at *6 (E.D. Ky. Mar. 13, 2009).  Louisa can be faulted as much, if not more, for persisting in litigation that could have been resolved at an earlier date.

The Sixth Circuit also considered this mootness argument as part of the standing issue on appeal.  *American Canoe Ass'n*, 389 F.3d at 543.  Louisa and the other defendants (no longer parties to this case) argued that American Canoe lacked standing due to the fact that "a favorable decision in this case will not redress the plaintiff's injuries because by the time the case is remanded for a judgment on the merits, the City will have completed a renovation project that will eliminate the pollution discharge problems."  *Id.*  The Sixth Circuit rejected this argument. It held that "even if the renovation project made it reasonably likely that the *discharge* violations would not recur, this hypothetical situation tells us nothing about the likelihood that the defendants' violations of the *monitoring* of the *reporting* requirements of the discharge permit would recur."  *Id.* at 543-44 (emphasis in original).  The Sixth Circuit's focus on continued monitoring and reporting violations also shows the reasonableness of American Canoe's persistence in this case after 2004.

Thus the ultimate question is whether American Canoe's approach was reasonable. *Thurman*, 90 F.3d at 1169 (holding that reasonableness is the overarching consideration when awarding attorney fees (citing *Hensley*, 461 U.S. at 435)).  In light of the defense tactics that Louisa employed, American Canoe's approach to this litigation was reasonable–the defendants have failed to point out what other tactic they expected American Canoe to employ besides

19

wholesale abandonment of the litigation.  Therefore, American Canoe is entitled to attorney fees for the time spent litigating the case from 2004 to 2009.  The Court has already deducted 75.16 hours for American Canoe's unreasonable work responding to Louisa's 2008 motion for summary judgment.

### 4. Time spent searching for standing affiants

American Canoe includes in its fee petition hours that TPM spent searching for potential standing affiants.  R. 175, Ex. 7 at 2-4.  Some of these calls were made in May 2001, before or contemporaneously with the filing of the complaint in this case.  *Id.*  These calls were to potential plaintiffs other than American Canoe.  Presumably, TPM was searching for other citizens or organizations to include in the complaint along with American Canoe.  TPM also bills for calls to standing affiants made in June, July, and August 2001, after filing the complaint.  *Id.*  Again, the overarching concern in attorney fee awards is "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  *Thurman*, 90 F.3d at 1169 (citing *Hensley*, 461 U.S. at 435).  No other plaintiffs were ever added to this litigation, so the efforts did not add to the overall relief obtained.  It would be unreasonable to compensate TPM for these 23.5 hours, and they are deducted from the lodestar.  If this had been an ordinary case where a client seeks counsel, rather than the opposite, there would not have been any hours billed searching for plaintiffs with standing.

### 5. Other

Louisa objects to the amount of time TPM attorneys spent on each specific task in its billing records, such as a Rule 26(f) meeting, oral argument, and its summary judgment motions.

R. 176 at 22-25.  When American Canoe should not have been pursuing certain tasks at all, the Court has deducted hours as explained above.  After carefully reviewing the billing records submitted, the Court finds TPM spent a reasonable amount of time on its other tasks.  Further, TPM's Terris provides detailed responses to each of American Canoe's assertions and thorough explanations for the hours billed.  *See* Second Terris Aff.

After deducting the 75.15 hours spent on response to Louisa's 2008 motion for summary judgment, and the 23.5 hours spent searching for other standing affiants, American Canoe petitions for 3,857.18 hours.[6]  Having reviewed all the hours and calculated the reasonable hourly rates of $300 for partners, $150 for associates, and $75 for paralegals, the lodestar figure for attorneys fees is:  **$585,622.50.**[7]

## IV. ADJUSTMENTS

"The primary concern in an attorney fee case is that the fee awarded be reasonable;" that is, a fee that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers.  *Reed*, 179 F.3d at 471 (citing *Blum*, 465 U.S. at 893, 897).  The trial judge may adjust the lodestar to reflect relevant considerations specific to the subject litigation.  *Reed*, 179 F.3d at 471-72 (citations omitted).  Louisa asks for an overall downward adjustment beyond the lodestar calculation.  This request is granted.

### A. Degree of Success

After calculating the lodestar, a court may adjust the fee upward or downward depending

---

[6]The hours spent on each of these tasks, R. 175, Ex. 6, was deducted from each individual attorney's total billing hours, R. 175, Exs. 5, 8.

[7]*See* Appendix A Lodestar Calculations.

on other considerations, though the Sixth Circuit has cautioned that such adjustments are "proper only in certain 'rare' and 'exceptional' cases supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Adcock-Ladd*, 227 F.3d at 350 (quoting *Del. Valley*, 478 U.S. at 565).   The most critical factor in determining the reasonableness of a fee award is the degree of success obtained.   *Isabel*, 404 F.3d at 416 (quoting *Farrar*, 506 U.S. at 114).

"Where a plaintiff has obtained excellent results, his attorney should recover a full compensatory fee; if a plaintiff obtains 'limited success, the district court should award only that amount of fees that is reasonable in relation to the success obtained.'"   *Isabel*, 404 F.3d at 416 (quoting *Hensley*, 461 U.S. at 435).   American Canoe's success can be neither termed *de minimis* as Louisa would have one believe or "excellent" as American Canoe presumably believes.

Louisa cites *DeLeon v. City of Ecorse* in support of its argument that American Canoe's success on its claims was *de minimis*.   300 F. App'x 380, 385 (6th Cir. 2008).   In *DeLeon*, the Sixth Circuit discussed the "degree of success" and found that where the success is minimal the award should be as well.   *Id.   Deleon*, however, is distinguishable because the success here was not minimal.   American Canoe achieved one very important thing through its initial notice letter–the building of the water plant–and also received relief for the numerous discharge and reporting violations–$30,000.

Louisa also argues that another appropriate measure of success would be to look at the relationship between the relief requested and relief obtained and points out that the $30,000

penalty is only 2.6% of the $1,150,950 penalty asked for by American Canoe.  R. 176 at 6-7.[8]
Louisa is correct that this can be an appropriate measure.  *See Farrar*, 506 U.S. at 114.  In
*Farrar*, the Supreme Court determined that the plaintiffs were the prevailing party even though
they only received nominal damages for their civil rights violations.  However, the Supreme
Court affirmed the Fifth Circuit's reversal of an award of the lodestar amount to plaintiffs
because the success obtained was so minimal.  *Id.* ("In this case, petitioners received nominal
damages instead of the $17 million in compensatory damages that they sought. This litigation
accomplished little beyond giving petitioners 'the moral satisfaction of knowing that a federal
court concluded that [their] rights had been violated' in some unspecified way." (quoting *Hewitt
v. Helms*, 482 U.S. 755, 762 (1987))).  The Sixth Circuit has also compared a plaintiff's
requested amount of relief to the amount it received in order to determine the degree of success.
*See Dowling*, 320 F. App'x at 449.

Again, however, these cases are distinguishable.  In *Dowling*, the Sixth Circuit only noted
that since the plaintiff obtained her entire damages demand, a full attorney fee award was
appropriate.  *Id.*  It stated nothing about cases where plaintiffs do not receive their entire desired
award.  In *Farrar*, the Supreme Court noted that the victory was a technical one because the jury
awarded no damages for the plaintiffs' civil rights violations.  506 U.S. at 115. In contrast,
American Canoe did not receive nominal damages, but a $30,000 civil penalty.  American Canoe
obtained such limited relief, in part, because of the poverty of the City of Louisa and the

---

[8]While American Canoe initially requested $1,150,950, it noted that it would not object to
a much less significant penalty of $200,000.  *See* R. 167 at 3.

forthcoming award of attorney fees.  R. 167 at 17-18.  For the persistent violations of discharge, monitoring, and reporting requirements, its penalty could have been much higher.  Thus, the penalty alone is not a good measure of the success because the court weighed other factors unrelated to success when determining the amount of the penalty, including the poverty of Louisa and potential for a significant fee award.

While Louisa's arguments that the success was minimal do not have merit, Louisa is correct that this is one of the rare and exceptional cases where the lodestar amount does not accurately reflect the degree of success obtained.  District courts may "adjust the fee upward or downward" and consider the ultimate "results obtained" in determining the appropriate adjustment.  *Hensley*, 461 U.S. at 434-36; *see also id.* at 436 ("If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.").

This case has two important stages of the litigation that must be considered when determining the amount of success achieved in relation to the amount of fees expended.  As discussed above, a significant amount of American Canoe's success was directly tied to the notice letter–which ultimately cost American Canoe little–and not the lawsuit itself–where American Canoe incurred a significant amount of fees.  Indeed, American Canoe's notice letter led to Louisa's settlement with the Kentucky Division of Water. R. 105, Ex. 1. American Canoe sent the notice letter on March 19, 2001.  Kentucky initiated its enforcement against Louisa on April 19, 2001.  American Canoe filed this lawsuit on May 21, 2001.  Louisa reached a

settlement with Kentucky by August 7, 2001. Though the threat of litigation may have encouraged Louisa to settle, American Canoe did not take part in any of the settlement negotiations. Louisa ultimately fulfilled its obligations under the settlement to build a new water treatment plant. The settlement Louisa undertook with the Kentucky Division of Water brought about the major changes in how Louisa treats its water.

In contrast, American Canoe's many hours spent on this case after Louisa completed its water treatment facility achieved significantly less success. It obtained no injunctive relief whatsoever. It recovered no relief for the post-2001 violations. And for the pre-2001 violations, the Court found that these violations caused no permanent damage. R. 167 at 27. American Canoe, however, did ultimately recover for the pre-2001 violations (albeit in 2009) and that is success on the merits.

So, how does the Court determine the "degree of success" and in turn the appropriate reduction? Unfortunately, "[t]here is no precise rule or formula for making these determinations." *Hensley*, 461 U.S. at 436. *Hensley*, however, gives guidance. As the Supreme Court said, "[i]t remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained." *Id.* at 437.

The Sixth Circuit also gives guidance. In *Kentucky Restaurant Concepts*, the Sixth Circuit affirmed an award that reduced the lodestar amount 35% for partial success. 117 F.

25

App'x 415, 421-22 (6th Cir. 2004). The plaintiffs achieved partial success in their attempt to have an adult entertainment regulatory ordinance declared unconstitutional. The court held that most of the substantive provisions of the ordinance were constitutional, a loss for the plaintiffs. However, it also held that the inspection provision of the ordinance was unconstitutional because it lacked time limits and enjoined the ordinance altogether–a success for the plaintiffs. *Id.* at 421. Thus, the plaintiffs achieved "a 'good' but not an 'excellent' result." *Id.* Since the court held that adult entertainment regulatory ordinances were constitutional, the defendant city, Louisville, could easily draft another statute with a time limit that would comply with the court's ruling. *Id.* Less successful than American Canoe, the plaintiffs in *Kentucky Restaurant Concepts* obtained only partial success, and probably no long-term relief.

Like *Kentucky Restaurant Concepts,* an adjustment is appropriate. In this case, the Court believes that a 25% reduction is necessary. First, the majority of American Canoe's success cost the least. When judging reasonableness, at first blush this appears startling. So, why not reduce the amount by 75% instead of 25%? There are many reasons. First, as the Court has noted before, American Canoe's lawsuit clearly had a positive effect on Louisa's water quality. Before the lawsuit, Louisa basically ignored the Clean Water Act. R. 167 at 4-5 ("the Superintendent of the Water Commission between 1975 and 2007, testified that they -- from the outset of the Clean Water Act, that they were in violation but did nothing to change that."). Moreover, American Canoe did not persist in this litigation just to prolong the inevitable.[9] Instead, it filed

---

[9]Obviously, American Canoe could have abandoned the litigation after the water treatment plant was built in 2004. Indeed, that might have been the "right" thing to do, and if the plaintiffs were local they very well may have counseled dismissal to protect the City of Louisa.

26

numerous motions for summary judgment in an effort to speed up the litigation. Those efforts were not successful, but the blame for that cannot be laid solely on American Canoe. Like the plaintiff in *Kentucky Restaurant Concepts*, American Canoe achieved good, but not excellent, results after the prolonged litigation. In fact, on the claims in which they persisted–related to the discharge and reporting violations–they won. Thus, when considering the totality of the relief obtained versus the amount of time and fees expended, a 25% reduction is appropriate.

A 25% reduction is also justified if you look at it from the overall success perspective of the litigation as a whole. American Canoe caused Louisa to build a water treatment plant and obtained relief for pre-2001 violations. American Canoe failed, however, to obtain injunctive relief and sought relief for claims for which it had not provided notice. Thus, American Canoe achieved some, but not all, of its goals. The Court does not make this decision lightly, but makes it after reviewing everything achieved in this case in relation to the cost of the litigation.

### B. Duplicative billing

Besides the degree of success, the Court may consider a number of other factors when determining an overall downward adjustment. *Isabel*, 404 F.3d at 415–16. These other factors include: (1) time and labor required, (2) the novelty and difficulty of the questions presented, (3) the skill needed to perform the legal service properly, (4) the preclusion of employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time and limitations imposed by the client or the circumstances, (8) the amount

---

That did not happen, and the Court does not have the authority to compel dismissal without a basis in the law.

involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Id.* (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). Awards in similar cases, the twelfth factor, cover a wide range of attorney fee amounts. *See, e.g., Sierra Club v. Hamilton County Bd. of County Comm'rs*, 504 F.3d 634, 636 (6th Cir. 2007) (affirming in part a $958,000 fee award in a three year case, but remanding for minor clarification); *Sierra Club v. Hankinson*, 351 F.3d 1358, 1359 (11th Cir. 2003) (affirming an award of $140,000 in fees for overseeing consent decree); *Greenfield Mills, Inc. v. Carter*, 569 F. Supp. 2d 737, 741-42 (N.D. Ind. 2008) (awarding counsel $950,000 in *interim* fees in an ongoing Clean Water Act case); *Earth Island Institute, Inc. v. S. Cal. Edison Co.*, 838 F. Supp. 458, 467 (S.D. Cal. 1993) (awarding $1.4 million in attorney fees for three year case); *Student Pub. Interest Research Group of N.J. v. Monsanto Co.*, 727 F. Supp. 876, 890 (D.N.J. 1989) (awarding TPM $309,000 in fees for a five year case with a nine day bench trial). Many of the other factors, dealing with attorney ability and the overall difficulty of the case, were addressed in the determination of the local market rate above.

Louisa argues that the fee award should not be many times more than the $30,000 civil penalty. *See* R. 176. at 4. However, the Supreme Court "reject[ed] the proposition that fee awards [ ] should necessarily be proportionate to the amount of damages a [ ] plaintiff actually recovers." *City of Riverside*, 477 U.S. at 574. Louisa also references the poverty of its citizens, who ultimately bear the burden of this award. *See* R. 176, Ex. 23. The Court is cognizant of this and does not award this fee lightly. The Court, however, considered the impact attorney fees

would ultimately have on the City of Louisa when limiting the civil penalty to $30,000. R. 167 at 18 ("[I]f this was the amount alone, the Court would impose a much more significant penalty for the City's blatant disregard of the law. The hammer, however, is yet to come . . . the plaintiff has indicated that they have significant cost and fees."). The Court imposed only a minor penalty knowing that the attorney fees in this case would be significant. Thus, the attorney fees should not be based on the already reduced civil penalties.

Finally, Louisa asks for a large overall reduction in fees because this case was "overstaffed and over lawyered." R. 176 at 22-25. Specifically, it challenges the fact that twelve lawyers and seventeen paralegals have worked on this case over the past eight years. *Id.* This is almost the entire TPM firm, which currently only has nine attorneys according to its website. *See* www.tpmlaw.com. When considering the first *Isabel* factor, "time and labor required," Louisa's argument has merit. "[The Sixth Circuit] has recognized the propriety of an across the board reduction based on excessive or duplicative hours." *Auto Alliance Int'l, Inc. v. U.S. Customs Serv.*, 155 F. App'x 226, 228 (6th Cir. 2005) (citing *Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986)). This method is an acceptable alternative to line-by-line reductions, particularly when fee documentation is voluminous. *Id.* "When the issue is a question of the lawyer's judgment in billing for a particular number of hours on a piece of work, we must depend in larger measure on the fairness of the District Court in assessing the needs of the case." *Coulter*, 805 F.2d at 152.

The determination that an indefinite number of hours are excessive or duplicative is a finding of fact, and the Sixth Circuit has repeatedly approved across the board reductions of 25%

for what courts found to be duplicative billing. *See Auto Alliance,*155 F. App'x at 228; *Hudson v. Reno*, 130 F.3d 1193, 1209 (6th Cir. 1997), *abrogated on other grounds by Pollard v. E.I. du Pont de Nemours & Co*., 532 U.S. 843 (2001). The Court will not engage in line-by-line examination of hours spent on each task, as American Canoe's billing overall is justified in great detail by hundreds of pages of computerized records and Terris's affidavit. Second Terris Aff. at 3-7. However, Terris explains that "because of the length of this case and the natural turnover that all law firms experience, the primary associate and paralegal have changed over the years." *Id.* at 3. With twelve lawyers and seventeen paralegals working on this case, TPM lawyers must have spent a considerable amount of time bringing the new lawyers and paralegals on the case up to speed over the past eight years. In its final fee petition, American Canoe asks for fees for thirteen lawyers, but only bills for the work of eleven paralegals. On its own, American Canoe eliminated the charge for six paralegals who each worked less than five hours on the case. *See* R. 175, Exs. 5, 8; R. 177, Ex. 32. Therefore, based on the time spent duplicating work as this case changed hands over its eight year life-span, the hours calculation is reduced. Because of American Canoe's own efforts to compensate for duplicative billing, only a 10% reduction is in order instead of the more common 25% reduction. *See Ky. Restaurant Concepts*, 117 F. App'x at 419 (affirming district court's reduction by 10% for duplicative billing).

Under *Adcock-Ladd*, reductions are made from the lodestar amount. Accordingly, the 10% reduction for duplicative efforts and the 25% for limited success are combined into one 35% reduction. 227 F.3d at 349 ("[t]he trial court may then, within limits, adjust the 'lodestar' to reflect relevant considerations" (citing *Reed*, 179 F.3d at 471-72)). Thus, the $**585,622.50**

30

lodestar amount is reduced by 35% to an award of **$380,654.63** for attorney fees.

## V. FEE PETITION

In addition to the lodestar figure calculated above, American Canoe requests $129,418 in fees for the time spent working on the attorney fee petition itself. *See* R. 177, Ex. 37. This, of course, is using Washington, D.C. rates. When converted to Kentucky rates, American Canoe is still requesting $77,078. In any event, Louisa argues that this amount should be reduced. "In the absence of unusual circumstances, the hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers without a trial and should not exceed 5% of the hours in the main case when a trial is necessary." *Coulter*, 805 F.2d at 151; *see also Auto Alliance,* 155 F. App'x at 229; *Say v. Adams*, No. 7-CV-377, 2009 WL 804994, at *7 (W.D. Ky. Mar. 25, 2009). The $129,418 that American Canoe requests represents 34% of its fee award for the main litigation (when converted to Kentucky rates, the amount is still 20% of the fee award). This amount must be reduced for excessiveness, although there are some exceptional circumstances present.

American Canoe argues that exceptional circumstances exist here, because only an attorney familiar with the case could review the 2,200 time slips for eight years of litigation. R. 177 at 11-12. Its own actions show that this is incorrect. Through the eight years of litigation in this case, TPM maintained computerized billing records. *See* R. 175, Ex. 7, 10, 13. Using these records, determining the hours for the fee award should not have taken an unreasonable amount of time.

However, the fee petition did involve complicated legal issues on both sides, such as

31

determining the prevailing party and degree of success. One Kentucky court recognized exceptional circumstances and awarded 10% of the main litigation fees for preparing the fee petition. *Jaguar Cars v. Cottrell*, No. 94-78, 1999 WL 1711083, at *1 (E.D. Ky. Oct. 25, 1999). In that case, the Court justified the higher award because, just like in this case, the parties spent time briefing "the convoluted issue as to whether Plaintiff was a prevailing party." *Id.* Terris of TPM explains that much of the work was spent on the fee petition researching legal issues and contacting affiants. Second Terris Aff. at at 8. There are complicated legal issues involved in this fee petition, justifying an exceptional award over the 3% amount. *See* 805 F.2d at 151.

Therefore, like in *Jaguar Cars*, the fee award for time spent calculating the attorney fee petition is 10% of the underlying award, or **$38,065.46**. This is a substantial decrease from American Canoe's request of 34%, but accounts for the exceptional amount of time that was necessary to fully brief these issues and to submit 37 corresponding exhibits. The final attorney fee award (excluding expenses) is **$418,720.09**.

## VI. EXPERT FEES

33 U.S.C. § 1365(d) specifically allows recovery for expert witness fees. The statute calls for "reasonable attorney and expert witness fees . . . whenever the court determines such an award is appropriate." *Id.* Louisa argues that American Canoe should not recover any fees for their experts, because they did not provide "any useful testimony for the Court to consider." R. 176 at 32-34. American Canoe requests $212,938.78 in expert fees. American Canoe hired two experts: Dr. Bruce Bell, an environmental expert who consulted with TPM throughout the litigation, and Dr. Michael Kavanaugh, an economist. *See* Second Terris Aff. The award for

32

expert fees, as part of the fee award, must reflect the overall reasonableness standard of *Thurman.* 90 F.3d at 1169.[10]  This requires that the Court award fees for a reasonable amount of time in relation to the significance of the relief.  American Canoe's request is unreasonable.

Dr. Bell's testimony was not valuable and did not add anything to the litigation.  R. 167 at 6 ("Dr. Bruce Bell did not in any credible way refute Dr. Armstead's analysis").  Specifically, the Court did not find his theory on harm to the river to be credible because Dr. Bell "is not a biologist, [ ] never studied the river, and just made general assumptions." *Id.* at 21.  His criticism of Louisa's treatment plant ignored a key fact about the chemicals in the water.  *Id.* at 24.  American Canoe argues that the Court considered Dr. Bell's work in its liability determination.  R. 177 at 8.  But the Clean Water Act is a strict liability statute, and thus, no expert opinion was required to determine that Louisa was liable for its violations.  It was not reasonable or appropriate to employ an environmental expert who is not a biologist and never visited the site of the Clean Water Act violations.  R. 167 at 21.  For these reasons, the Court will not award expert fees for Dr. Bell's work in this litigation.

American Canoe's use of Dr. Bell resembles the expert use in *Student Pub. Interest Research Group of N.J., Inc. v. Monsanto Co.*, another Clean Water Act case.  721 F. Supp. 604,

---

[10]The Sixth Circuit has not spoken on this issue.  Though the courts have not developed case law on expert fees as thoroughly as they have for attorney fee calculations, the statutory standard is the same for both.  Both awards must be "reasonable" when the court determines they are "appropriate."  Other district courts within the Sixth Circuit have applied a reasonableness analysis to expert fees.  *See Disabled Patriots of America, Inc. v. Odco Invs., Ltd.*, 2009 WL 1767582, at *7 (N.D. Ohio, June 23, 2009) ("[t]he Court finds the total expert fees of $5,950 to be reasonable and will be awarded in full.); *Citizens Against Pollution v. Ohio Power Co.,* 484 F. Supp. 2d 800, 814 (S.D. Ohio 2007) (denying expert fees for experts that testified regarding to claims that the plaintiffs lost); *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 382 (S.D. Ohio 2006).

624 (D.N.J. 1989), *overruled on other grounds by Pub. Interest Research Group of N.J., Inc. v. Windall*, 51 F.3d 1179 (3d Cir. 1995). There, the district court thought the plaintiffs' experts were of "very little, if any, assistance" in guiding the court's discretion. *Id.* (quoting a previous opinion of the district court). The court stated that the "plaintiffs should not recover any fees for experts who were retained to state the obvious, or explain and exemplify abstract theories which were of questionable relevance to the case or assistance in determining an appropriate penalty." *Id.* The court ultimately reduced the expert fees for time that the plaintiffs' experts spent on claims on which no success was obtained. The court stated: "The concept of awarding plaintiffs' 'reasonable expert witness fees' under section 1365(d) does not, in my view, mandate reimbursement to counsel for wasteful expenditures or rewarding them for poorly chosen and ineffectual means of proof." *Id.* at 625. The D.C. Circuit has also considered whether an expert was "valuable in establishing the Clean Water Act claim," though in that case the court found the expert was not valuable because the plaintiff lacked standing under the Clean Water Act. *Citizens Coordinating Comm. on Friendship Heights, Inc. v. WMATA*, 765 F.2d 1169, 1174 (D.C. Cir. 1985). Similarly here, Dr. Bell had no knowledge of the river, and the Court observed that "it appears that his expert opinion as to the environmental impact of the violations is based on what he believes could theoretically happen as a result of the violations, not on what has actually happened." R. 167 at 6-7.

On the other hand, American Canoe's economic expert, Dr. Kavanaugh, did assist the Court. The Court could not reach a conclusion regarding Louisa's economic benefit from its violations. R. 167 at 8 ("what became clear during the hearing is that the murkiness of the

benefits in capital costs is as murky as the Big Sandy River.").  This was because Louisa and American Canoe's experts presented conflicting, credible evidence.  While the Court found that Louisa's economic expert "did an effective job of pointing out how the plaintiffs' calculations were faulty," it also did not accept the assumptions of Louisa's expert.  *Id.*  Thus, although the Court did not adopt Dr. Kavanaugh's testimony as its conclusions, without Dr. Kavanaugh present the Court would have relied more heavily on the testimony of Louisa's expert. Therefore, the Court will award American Canoe the fees it requests for Dr. Kavanaugh's work on the economic loss determination.[11]

American Canoe submits the invoices for Dr. Kavanaugh as part of its reply to the motion for attorney fees.  *See* R. 177, Ex. 31.  The invoices, dated from November 2001 to August 2009, total $25,392.30.  Thus, American Canoe receives expert fees in that amount.

## VII. OTHER EXPENSES

American Canoe requests $47,043.34 for other expenses.  R. 175, Exs. 19, 21.  Like attorney fees, the Court can only award a reasonable amount of expenses. 33 U.S.C. § 1365(d). These "costs incurred by a party to be paid to a third party . . . have long been recoverable in the Court's discretion."  *Sigley*, 2000 WL 145187, at *9.

Louisa argues that payment for attorney travel expenses of $10,269.68 should not be awarded because American Canoe should have hired local counsel.  R. 176 at 38.  Louisa is

---

[11]American Canoe also cites Dr. Kavanaugh for his work as an economist on the *Laffey* Matrix, the formula used to calculate attorney fees for Washington, D.C. law firms, though it does not appear to have submitted bills for that time.  R. 175 at 19-23.  If it had the Court would not have awarded fees for this work, since these calculations served no purpose in the resolution of this litigation.

correct.  The Court recognizes that reduction of the hourly rate seems to sufficiently lower American Canoe's fee based on its choice of out of town counsel.  However, it is not logical to award out of town travel expenses after determining that American Canoe's choice of Washington, D.C. counsel was unreasonable.  *See supra* III.A.  Therefore, the expense fees for TPM to travel to Kentucky will not be awarded.  The Court deducts $10,269.68 from American Canoe's expense request.

Louisa also argues that American Canoe should not receive compensation for its overnight fax and delivery charges, photocopying, scanning and printing, and transcript reporting, because these expenses were only incurred for American Canoe's own convenience or were part of the firm's overhead expenses.  *Id.* at 38-39.  However, the filings for this case were not in electronic form.  Thus, higher printing, fax and delivery charges from 2001 to 2009 than what would be awarded in a more recently filed case are reasonable and will be awarded.

Louisa challenges overtime payments for staff as unreasonable, and only for American Canoe's own convenience.  *Id.* at 39.  In its reply, American Canoe submits an affidavit from Bruce Terris stating that overtime costs were only incurred when absolutely necessary to meet a court deadline.  *See* Second Terris Aff.  The Third Circuit supports such an expense award, holding that "in a complex, multi-year action such as this, a certain amount of overtime is inevitable."  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 718 (3d Cir. 2005). The overtime costs will be awarded.

American Canoe also requests reimbursement for its electronic legal research costs. Louisa challenges the Westlaw and Lexis/Nexis billing, arguing that fees for electronic research

36

should be part of the overall firm overhead and not billed to particular clients.  R. 176 at 38.  A circuit split exists on whether electronic legal research is already factored into attorney billing rates, or should be awarded as a separate fee.  *See Trs. of the Constr. Indus. and Laborers Health and Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258 (9th Cir. 2006) (collecting cases on both sides of the split).  The Sixth Circuit has never reached this issue.  *See Auto Alliance*, 155 F. App'x at 229 (declining to take a position on the issue since the plaintiff failed to submit evidence or argument that might support the computer research costs).  American Canoe is entitled to expenses for TPM's Westlaw fees.  This is in line with a growing consensus of the circuit courts.  The use of online research services "likely reduces the number of hours required for an attorney's manual search, thereby lowering the lodestar."  *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 369 F.3d 91, 98 (2d Cir. 2004).  The circuits that oppose the separate billing of electronic research find that if an attorney bills for his time researching—whether in books or electronically—the hourly rate is sufficient compensation.  *See Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 325 (8th Cir. 1993).  Since TPM ordinarily bills its clients separately for electronic research in addition to its hourly rate, it is reasonable to award American Canoe fees for this expense.

Therefore, American Canoe receives $36,773.66 for other expenses incurred during the litigation.  This includes $2,222.47 in expenses that American Canoe accumulated while preparing its fee petition.  *See* R. 177, Ex. 37.  Combined with the expert fees, American Canoe receives an expense award of $62,165.96.

37

## VIII. CONCLUSION

To award attorney fees under 33 U.S.C. 1365(d), the significance of the overall relief obtained by American Canoe is considered in relation to the hours reasonably expended on the litigation.  For the reasons explained above, the Court awards Plaintiffs American Canoe and Sierra Club **$418,720.09** in attorney fees and **$62,165.96** in expenses under § 1365(d).

This the 27th day of January, 2010.

**Signed By:**

*__Amul R. Thapar__*  ᴀᴛ

**United States District Judge**

Appendix A
Lodestar Calculations

| Individual's Initials | Hourly Rate | Hours Reasonably Expended | | Total Fee Amount |
|---|---|---|---|---|
| ACA | $150 | 9.47 | DCT | $1,420.50 |
| ARK | $150 | 2.57 | DCT | $0* |
| ASA | $150 | 583.57 | DCT | $87,535 |
| BJT | $300 | 438.65<br>9<br>-13.53 | DCT<br>CTA<br>deduction | $130,236 |
| | | **434.12** | | |
| CSP | $300 | 23.71<br>2.53<br>-.7 | DCT<br>CTA<br>deduction | $7,662 |
| | | **25.54** | | |
| CKD/CDM | $150 | 2.54 | CTA | $0* |
| DAS | $150 | 111.13<br>89.59 | DCT<br>CTA | $30,108 |
| | | **200.72** | | |
| KLM | $300 | .92<br>3.16 | DCT<br>CTA | $0* |
| | | **4.08** | | |
| KOL | $150 | 19<br>-3.25 | DCT<br>deduction | $2,362.50 |
| | | **15.75** | | |
| LBT | $150 | 1.44 | CTA | $0* |
| LCS | $150 | 8.79 | CTA | $1,318.50 |
| MGS | $150 | 1,597.88<br>-57.58 | DCT<br>deduction | $231,045 |

| | | | | |
|---|---|---|---|---|
| | | **1540.3** | | |
| SAA | $150 to 12/2001 | 16.91 -2.25 | DCT deduction | $2,199 |
| | | **14.66** | | |
| | $300 after 1/2002 | 19.19 44.85 | DCT CTA | $19,212 |
| | | **64.04** | | |
| SLS | $150 | 1.44 | DCT | $216 |
| ZSF | $150 | 9.58 | DCT | $1,437 |
| AH | $75 | 53.01 | DCT | $3,975.75 |
| AL | $75 | 369.42 | DCT | $27,706.50 |
| AMC | $75 | 8.25 -1.25 | DCT deduction | $525 |
| | | **7** | | |
| CMC | $75 | 26.73 | DCT | $2,004.75 |
| DPR | $75 | 73.16 | DCT | $5,487 |
| EK | $75 | 8.06 | DCT | $604.50 |
| ENR | $75 | 245.34 -3.85 | DCT deduction | $18,111.75 |
| | | **241.49** | | |
| FLB | $75 | 3.5 | DCT | $0* |
| JKV | $75 | 15.24 | DCT | $1,143 |
| KR | $75 | 3.5 | DCT | $0* |
| KW | $75 | 69.89 | DCT | $5,241.75 |
| LJF | $75 | .78 | DCT | $0* |
| MER | $75 | 9.03 | DCT | $677.25 |
| MWC | $75 | .78 | CTA | $0* |

| | | | | |
|---|---|---|---|---|
| RM | $75 | .5 | CTA | $0* |
| RN | $75 | .82 | DCT | $0* |
| SMO | $75 | 55.66 | DCT | $4,174.50 |
| TDB | $75 | 16.25 | DCT | $1,218.75 |
| | | | | **$585,622.50** |

<u>Hourly Rate</u>
Attorney billing level (i.e. partner or associate) are from TPM attorney resumes, R. 175, Ex. 3

<u>Hours Reasonably Expended</u>
DCT =            Hours spent on district court litigation, *see* R. 175, Ex. 5
CTA =            Hours spent on court of appeals litigation, *see* R. 175, Ex. 8
Deductions =    Time excluded for response to the defendant's motion for summary judgment, R. 175, Ex. 6 at 11
                        Time excluded for search for standing affidavits, 175, Ex. 6 at 1

<u>Total Fee Amount</u>
Hourly Rate X Hours Reasonably Expended

$0*= American Canoe chose not to bill for that individual's work

41